IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

C. RICHTER TAYLOR, JR., )
        Plaintiff, )
)
vs )    Civil Action 07-528
)
FORTIS BENEFITS INSURANCE CO., )
and TITUS & McCONOMY LONG TERM )
DISABILITY BENEFITS PLAN, )
        Defendants. )

## REPORT AND RECOMMENDATION

I. <u>Recommendation</u>:

      It is respectfully recommended that the motion for summary judgment filed by defendant Union Security Insurance Company, formerly known as Fortis Benefits Insurance Company (Document No. 16), be granted.

II. <u>Report</u>:

      Presently before the Court is a motion for summary judgment submitted by Union Security Insurance Company ("Union Security"), formerly known as Fortis Benefits Insurance Company. For reasons discussed below, Union Security's motion for summary judgment should be granted.

      The plaintiff, C. Richter Taylor, Jr., formerly an attorney with Titus & McConomy ("T&M"), commenced this action alleging that defendants Fortis Benefits Insurance Company, now known as Union Security, and T&M's Long Term Disability Benefits Plan (the "Plan") wrongfully denied him long term disability benefits to which he was entitled as a participant in

the Plan. Since the plaintiff's claim for benefits arises pursuant to an employee benefit plan, it comes under the auspices of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., for which the Court has federal question jurisdiction.[1]

It is alleged in the complaint that from 1966 until February 1981, the plaintiff was an attorney at the law firm of Moorhead & Knox; that in February 1981, Moorhead & Knox merged into Buchanan Ingersoll, P.C. ("B.I."), at which time the plaintiff became a shareholder at B.I.; that while working at B.I., the plaintiff occasionally displayed irrational, erratic behavior and experienced significant mood swings; that he attended therapy sessions with psychologist Dr. Anne Savisky to address his behavior; and that during this period, the plaintiff did not know that he had any medical, psychological or psychiatric condition.

The plaintiff contends that by the late 1980's, his episodes of erratic behavior and mood swings became more frequent, and other attorneys at B.I. noticed a significant decrease in his job performance; that on December 31, 1989, his employment at B.I. was terminated; and that upon leaving B.I., he became a partner in the law firm of Cindrich & Titus, later renamed Titus & McConomy (collectively, "T&M.").

The record shows that from 1989 until November 30, 1995, the plaintiff was a practicing attorney and partner in the T&M law firm. During his employment there, the plaintiff avers that T&M established the Plan to provide long term disability benefits to its partners and

---

1. We will refer to the moving defendant as Union Security. With respect to the Plan, the plaintiff informs the Court that on April 29, 2003, the Plan's sponsor/administrator, Titus & McConomy, LLP, filed a petition for relief under Chapter 11 of the United States Bankruptcy Code at Number 03-25332-BM in the United States Bankruptcy Court for the Western District of Pennsylvania. See, Document No. 7. The plaintiff avers that by virtue of the bankruptcy filing, all proceedings against the Plan are stayed pursuant to 11 U.S.C. § 362. Id.

employees. Union Security insured the Plan, as T&M purchased a "Group Long Term Disability Insurance Policy" from it which provided disability insurance coverage to T&M's partners and employees effective June 1, 1995 ("Union Security's policy") .

On November 30, 1995, the plaintiff ceased being a partner at T&M, and his employment was terminated. The plaintiff explains that during his tenure at T&M, his behavior became increasingly erratic and impulsive, and he had frequent unexplained absences which caused his job performance to decline; that in 1994, he began psychological treatment with Dr. Learita Scott; and that during this time, he was not diagnosed with a medical, psychological or psychiatric condition that could explain his erratic behavior, but his conduct resulted in the termination of his employment at T&M.

Following his discharge from T&M, the plaintiff continued working as an attorney from 1996 until 2001, first at Houston Harbaugh, P.C. ("H.H."), then at Plummer Harty & Owsiany ("P.H.O."). The plaintiff asserts that he joined the law firm of H.H. in 1996, but his tenure there was marked by erratic behavior, and he was unable to adequately perform his duties; that during his tenure with H.H., he continued his psychological counseling with Dr. Scott, and he also began seeing a psychiatrist, Dr. Irving Golding; that he was prescribed medications to counter certain symptoms he was experiencing, but he was not diagnosed with, nor had any knowledge of a medical, psychological or psychiatric condition that caused his erratic behavior; and that in 1999, his employment at H.H. was terminated.

In 1999, following his departure from H.H., the plaintiff worked as an attorney at P.H.O. The plaintiff avers that during his tenure there, he continued to display frequent episodes of erratic behavior and declining job skills; that while working at P.H.O. in 2000, he suffered a

manic episode which his doctors believed was consistent with bipolar disorder; that he was placed on Lithium and Paxil to treat his symptoms, but the medications could not prevent his social skills and job performance from deteriorating; and that by 2001, his employment at P.H.O. was terminated, after which he did not practice law with any firm.

The plaintiff contends that on May 29, 2002, following a severe manic episode, he was admitted to Western Psychiatric Institute and Clinic ("WPIC") for in-patient treatment. During this time, the plaintiff avers that he was formally diagnosed with bipolar disorder, dysfunction of the frontal lobe of his brain and sleep apnea; that following his in-patient treatment at WPIC, he continued drug therapy and clinical treatment for his conditions, but his conditions rendered him completely unable to practice law; and that since January 2002, he was determined to be eligible for disability benefits from the Social Security Administration.

The plaintiff asserts that after being diagnosed with bipolar disorder following his stay at WPIC, he learned of the availability of coverage under Union Security's policy. On February 15, 2003, the plaintiff submitted a disability claim to Union Security, claiming he had been disabled due to bipolar disorder and front lobe dementia since November 30, 1995. In a letter dated April 22, 2003, Union Security denied the plaintiff's claim for benefits on several grounds, including that he gave late notice of his claim to it, which prejudiced its ability to evaluate the claim, and that he was not "disabled" under the terms of its policy. The plaintiff appealed the denial of his claim for benefits, but Union Security upheld its decision in reviews dated January 18, 2005 and September 12, 2005, and the plaintiff exhausted his administrative remedies under its policy.

On April 20, 2007, the plaintiff commenced this suit against the defendants. In

4

his complaint, the plaintiff contends that Union Security wrongfully denied him benefits and breached its fiduciary duty in denying his claim in violation of ERISA.

Union Security has moved for summary judgment on the plaintiff's claims. In support of summary judgment, Union Security makes several arguments, including that this action is barred due the plaintiff's seven year delay in submitting his claim to it, and that he failed to prove he was disabled during the policy's qualifying period. Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); Biener v Calio, 361 F.3d 206, 210 (3d Cir. 2004).

Union Security first argues that the plaintiff's claim for benefits is barred due to his failure to provide notice of his claim within a reasonable time period, which caused it prejudice. Union Security's policy provides that it "must have written notice of any insured loss within 30 days after it occurs, or as soon as reasonably possible".[2]

The record shows that on February 15, 2003, the plaintiff submitted his disability claim to Union Security, wherein he claimed he was disabled due to bipolar disorder and front lobe dementia since November 30, 1995.[3] Union Security insists that the plaintiff's seven year delay in submitting his claim to it prejudiced its ability to evaluate the claim.

An insurer of an ERISA-covered plan can deny a claim for benefits if it shows it was prejudiced by an insured's failure to provide timely notice of a claim. See, e.g., Pavelosky v. Unum Provident Corp., 2006 WL 2089958, *1, n.1 (W.D.Pa., July 25, 2006) ("defendants would have had to demonstrate actual prejudice from any late notice or proof of claim"); Foley v.

---

2. See, a copy of the policy at designated p. US 30.
3. See, defendant's concise statement of facts at ¶ 6, and plaintiff's response thereto.

International Broth. of Electrical Workers, 1 F.Supp.2d 797, 803 n.6 (E.D.Pa. 2000) ("Even if Foley's appeal were untimely, defendants would not prevail, because they have not shown that they were prejudiced by the untimely submission"); Garcia v. Fortis Benefits Ins. Co., 2000 WL 92340, *9-11 (E.D.Pa., Jan, 24, 2000) (Pennsylvania's notice-prejudice rule requires an insurer to show it was prejudiced by an untimely claim submission), citing Unum Life Ins. Co. v. Ward, 526 U.S. 358 (1999) (discussing California's notice-prejudice rule), and Brakeman v. Potomoc Ins. Co., 371 A.2d 193 (PA 1977).

Union Security asserts it was prejudiced by the plaintiff's seven year delay in submitting his disability claim, because much of the medical evidence relating to the claim no longer exists. For instance, Union Security avers:

> Plaintiff treated with Learita Scott, Ph.D. both before and after the time he claims he became disabled. However, records from Dr. Scott are not available before 1997. Plaintiff also treated with Dr. Golding during the relevant time period. Dr. Golding died in 2000 and the majority of his medical records are no longer available. Finally, [the plaintiff] also treated with Licensed Therapist Ann Savisky beginning in 1994. She also died in the intervening years and her records are no longer available.[4]

The record supports these averments.[5]

Union Security explains that the contemporaneous medical records which are not available are important for these reasons:

> This Policy contains a 90-day Qualifying Period during which time a claimant must be disabled. (US 16, 20). Even assuming for argument sake that [the plaintiff] had

---

4. See, Union Security's reply brief at p. 3.

5. See, defendant's concise statement of facts at ¶¶ 7-9, and plaintiff's response thereto.

> bipolar disorder in 1995, he must prove that this condition was totally disabling during the 90-day Qualifying Period. Without medical records from this time period, this is impossible for plaintiff to prove. Proof was especially needed for [the plaintiff's] claim since he worked both prior to and after November 30, 1995, when he claims that he became disabled.[6]

"[T]he purpose of the prejudice requirement is to allow an insurer to refuse payment only if its procedural handicap has led to disadvantageous, substantive results -- in other words, if the insured's violation of [the] contract has proximately caused its insurer damages." Trustees of University of Pennsylvania v. Lexington Ins. Co., 815 F.2d 890, 898 (3d Cir. 1987). Where a plaintiff's delay in providing notice of a claim prevents an insurer from investigating the claim, or participating in a defense or settlement of the matter, actual prejudice may result. See, Brooks v. American Centennial Ins. Co., 327 F.3d 260, 265 (3d Cir. 2003); Rite Aid Corp. v. Liberty Mutual Fire Ins. Co., 414 F.Supp.2d 508, 520-21 (M.D.Pa. 2005). In Rite Aid, supra, the Court ruled that a plaintiff's delay in providing notice did not prejudice the insurer as a matter of law, since no evidence showed that the delay caused witnesses to be unavailable, evidence to be destroyed, or otherwise prevented the defendant from investigating the claim, or participating in the defense of the case. 414 F.Supp.2d at 520-21.

In its initial denial of the plaintiff's claim, Union Security apprised him that due to the late notice of his claim, "we are unable to determine our liability and consequently must deny your claim due to the prejudice it has caused us".[7] Union Security explained that "the extreme passage of time prevents us from obtaining any independent medical evaluations that we might

---

6. See, defendant's reply brief at pp. 3-4.

7. See, a copy of the policy at designated p. US 871.

have deemed necessary to clarify your condition at the time of onset."[8]  However, when the plaintiff appealed the denial of his claim, he submitted further documents to Union Security to consider, including reports from Mark D. Miller, M.D. which discussed his evaluation of the plaintiff, as well as Dr. Miller's conversations with Dr. Learita Scott and attorneys with whom the plaintiff worked.[9]

In reviewing the plaintiff's appeals, Union Security continued to claim it was prejudiced by the plaintiff's late submission; however, it upheld the denial of his claim on grounds that the medical evidence and information before it failed to show that the plaintiff met the policy's definition of disability.[10]  We agree with Union Security that its investigation may have been more complete had the plaintiff submitted his claim to it sooner.  However, we cannot say as a matter of law that Union Security suffered actual prejudice due to the plaintiff's late notice, as it investigated his claim and proffered a defense utilizing the information it had.

Nonetheless, we find that Union Security is entitled to summary judgment on the plaintiff's claims, as there is insufficient documentary evidence to support his claim that it wrongfully denied him benefits.  The plaintiff's claim for benefits is premised on § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of [the] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

---

8. Id. at p. US 872.

9. Id. at pp. US 367-370 and 589-602.

10. Id. at pp. US 107-112 and 128-139.

In <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), the Supreme Court established the proper standard of review for challenged denials of claims under § 1132(a)(1)(B) of ERISA, holding:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a <u>de</u> <u>novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility to benefits or to construe the terms of the plan.

489 U.S. at 115. Where a Plan expressly gives its administrator or fiduciary discretionary authority to determine benefits, a deferential standard of review is applied to a denial of benefits, and it is reviewed under an "arbitrary and capricious standard". <u>Id.</u> at 111-115.

To determine the proper standard of review then, we must look to the terms of Plan documents to ascertain if they granted Union Security discretion to interpret Plan terms or to determine one's right to benefits. In this case, the policy clearly cloaks Union Security with discretion to decide a participant's eligibility for benefits.[11] Thus, we will review the denial of the plaintiff's claim under an arbitrary and capricious standard of review.

Significantly, the Third Circuit Court of Appeals has stated: "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." <u>Pinto v. Reliance Standard Life Insurance Co.</u>, 214 F.3d 377, 378 (3d Cir. 2000). As explained in <u>Pinto</u>, "insurance carriers [or other such fiduciaries paying benefits out of their own funds] have an active incentive to deny close claims in order to keep costs down". <u>Id.</u> at 388. Here, it appears that Union Security has such an economic conflict of interest, for it admits that it both funds

---

11. See, a copy of the policy at designated p. US 30.

and administers benefits under the Plan.[12]

In cases where a court finds a conflict of interest, it is to modify the arbitrary and capricious standard using a "sliding scale method, intensifying the degree of scrutiny to match the degree of conflict." Pinto, 214 F.3d at 379. In employing the sliding scale method, our Court of Appeals has instructed that we take into account the following factors in deciding upon the severity of the conflict:

> (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction.

Stratton v. E.I. Dupont De Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004), citing Pinto, 214 F.3d at 392.

As to the first of these factors, the Court in Stratton assumed "there was a sophistication imbalance between the parties", as the plaintiff was not likely to have had ERISA claims experience, whereas the defendant, "a large, successful company with many employees, had numerous such claims." Stratton, 363 F.3d at 254. Thus, the Court in Stratton found "this factor weighs in favor of heightening the standard." Id. In cases as here, however, where a plaintiff is represented by counsel during most of the claim process, this factor should not raise the standard of review significantly. Post v. Hartford Ins. Co., 2005 WL 2455818, *11 (E.D.Pa., Oct. 5, 2005), aff'd., 501 F.3d 154, 165-66 (3d Cir. 2007). Here, since the plaintiff is an attorney, and as he was represented by counsel during most of the claim process, we find there

---

12. See, Union Security's brief in support of its motion for summary judgment at p. 8.

was not "a sophistication imbalance" between the parties, so as to require our degree of scrutiny to be heightened.

The second factor in our analysis -- information accessibility -- does not warrant imposing a heightened standard of review, since it appears that Union Security adequately informed the plaintiff of the criteria under which it reviewed his claim for benefits, as well as the reasons it denied his claim. Thus, this factor does not favor a heightened review.

As to the third factor, the exact financial arrangement between the insurer and the company, our Court of Appeals has stated that when an employer pays an independent insurance company to both fund and interpret a plan, as here, "it generally presents a conflict and thus invites a heightened standard of review." Pinto, 214 F.3d at 383. Indeed, "if the same entity that determines whether a claimant is disabled must also pay for disability benefits, that entity has a financial incentive to find him or her not disabled." Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 385 (3d Cir. 2003).

The fourth factor relating to the financial status of the administrator may be relevant here, for while the plaintiff presents no evidence as to the financial stability of Union Security, he has filed a "suggestion of bankruptcy" as to T&M, such that Union Security is not concerned with maintaining employee satisfaction. Based on the foregoing, Union Security's decision to deny the plaintiff's claim for benefits is subject to a moderately heightened arbitrary and capricious standard. In so finding, we are guided by the Third Circuit Court of Appeals' admonition that in cases where an insurance company both funds and administers benefits, and its structural conflict is not mitigated by an independent claim evaluation, our review should be more than slightly heightened. Post, supra, 501 F.3d at 164.

Still, the Third Circuit Court of Appeals has counseled:

> Even under the heightened [arbitrary and capricious] standard, a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.

Stratton, supra, 363 F.3d at 256.

Here, the plaintiff has not shown that Union Security failed to comply with Plan procedures. Further, it appears that Union Security's decision to deny the plaintiff's claim is supported by the record, as there is insufficient medical evidence to support his claim.

As recited above, Union Security determined that the plaintiff did not satisfy the definition of "disability" in its policy. The term "disability" is defined under the policy in pertinent part as follows:

> *Disability* or *disabled* means that in a particular month, you satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both the Occupation Test and the Earnings Test, but you need only satisfy one Test to be considered *disabled*.

The Occupation Test provides:

> [D]uring a *period of disability* (including the qualifying period), an *injury*, sickness or pregnancy requires that you be under the *regular care and attendance* of a *doctor,* and prevents you from performing at least one of the *material duties* of your regular occupation.[13]

In its motion for summary judgment, Union Security avers that the plaintiff failed to prove he was disabled during the 90-day Qualifying Period in its policy which commenced on

---

13. See, a copy of the policy at designated p. US 14. In their briefs, the parties focus solely on the "Occupation Test".

12

November 30, 1995. Under the policy, "*Qualifying* period means the length of time during a *period of disability* that you must be *disabled* before benefits are payable."[14] The Qualifying Period is 90 days.[15] Significantly, there are no treatment records on the plaintiff during the Qualifying Period which pertain to his claim.

> Thus, in upholding the denial of the plaintiff's claim, Union Security stated:
>
> The information submitted indicates Mr. Taylor's claimed onset date is November 30, 1995 and is based on the diagnosis of bipolar and frontal lobe dementia...
>
> ... The Committee was not able to identify any restrictions or limitations from the records submitted which would have prevented Mr. Taylor from performing the material duties of his occupation... as of November 30, 1995...
>
> ... We were unable to obtain treatment records prior to 1997 from Dr. Scott. Thus, we have no documentation of [plaintiff] being under the care and attendance of a doctor, as required by the policy. Further, the records that we have obtained do not document a disability at the time of Mr. Taylor's departure from [T&M]...
>
> After Mr. Taylor left [T&M], he continued working in his occupation for several years...[16]

In hopes of establishing his claim, the plaintiff relies on reports from Dr. Mark D. Miller, with whom he began treatment in 2002 during his stay at WPIC. In a report dated July 31, 2003, Dr. Miller states that he spoke with Learita Scott, the psychologist who treated the plaintiff for several years, and he reviewed her notes which date back to February of 1997; that

---

14. Id. at p. US 16.

15. Id. at p. US 20.

16. Id. at p. US 110.

Dr. Scott reports she saw the plaintiff for two years prior to 1997, for which she took no notes, but she believes the plaintiff showed symptoms consistent with bipolar illness as far back as 1995; and that Dr. Miller believes the plaintiff's history "is highly suggestive of the bipolar illness symptomatology interfering with his ability to work dated back to 2000 with certainty and to 1995 with reasonable medical certainty."[17]

Conversely, after reviewing Dr. Miller's report, as well as a peer review submitted by Dr. Stephan Kruszewski, Patricia Neubauer, Ph.D, a staff psychologist, issued an assessment dated December 14, 2004, in which she stated:

> Based on interview material gathered by Dr. Miller, Mr. Taylor was under the care of Dr. Golding and Dr. Scott during time frames relevant to ... the onset of the claim. Dr. Scott produced records after 3/20/97 and in a recent phone call denied knowledge of treatment prior to that date. Records verified by Dr. Scott to be penned by Dr. Golding are provided for dates of 6/15/95, the only visit found prior to onset of claim, and from 1996 and 1997... Dr. Scott told Dr. Miller that she had noted mood instability consistent with bipolar disorder dating to 1995. She has not verified that opinion in discussions with ... Employee Benefits staff or with supporting records...
>
> Dr. Kruszewski, an expert psychiatrist, provided a peer review. He concluded that the records don't support that bipolar disorder was present in 1995 such as to preclude working as an attorney. He further offers the opinion that he is not convinced of the diagnosis of bipolar disorder and offers theories that personality disorder features, alcohol abuse and medication induced symptoms or hypomania could have been the primary explanations for behavior in 1995...
>
> Based on the full review of the file and all submitted records including the peer review, there is no support that Mr. Taylor had a mood disorder, whether based on depression or bipolar

---

17. Id. at pp. US 590-594.

disorder with primary depressed presentation, that would
preclude working as an attorney on 11/30/95 and persisting
through a qualifying period...[18]

After Dr. Miller reviewed the reports of Dr. Neubauer and Dr. Kruszewski, he issued a supplemental report dated August 9, 2005, in which he acknowledged the lack of documentation to corroborate a diagnosis of bipolar disorder or any disorder that precluded the plaintiff from working during the relevant time period, stating: "in that bipolar disorder is often subtle and missed as the correct diagnosis in its early phases, it is not surprising to me that this diagnosis was not spelled out in [the plaintiff's] records."[19] Dr. Miller also stated:

> I understand that specific tests need to be supplied in a
> disability determination and that documented evidence is
> the only true indicator of certifiable disability. I further
> understand that making a claim retrospectively presents
> unusually difficult assessments of eligibility...
>
> ... With the severity of [Mr. Taylor's] manic presentation
> to the inpatient unit, one can reasonably ask the question:
> when did these symptoms begin? When one looks backward
> and takes into account the gross irregularities at work and
> the progressive decline in function over time, it is reasonable,
> in my view, to conclude that this illness was likely operating
> earlier during the time of his work as a lawyer. Where one
> draws the line to invoke a disability claim, I appreciate is a
> difficult decision.[20]

Union Security asserts that Dr. Miller -- in his August 9, 2005 report -- poses the relevant question: "when did [the plaintiff's] symptoms begin?" According to Union Security, since Dr. Miller cannot answer this question, it cannot be said to have acted in an arbitrary and

---

18. Id. at p. US 91.

19. Id. a p. US 369.

20. Id. at pp. US 369-370.

15

capricious manner when it could not find that the plaintiff was disabled in 1995 based on the available medical records.

In this unfortunate case, the record shows that the plaintiff's job functioning declined during the relevant time period. Evidence from plaintiff's co-workers at that time, including Paul Titus of T&M -- who spoke to Dr. Miller -- and Paula Schaukowitch, the plaintiff's secretary -- who submitted an affidavit -- show that the plaintiff was moody, not functioning well, not bringing money to the firm, was unreliable and not productive, had declining brief writing skills, worked irregular hours and delegated work to other attorneys.[21]

Sadly for the plaintiff, there is not sufficient documentary evidence to show that a sickness required him to be under the regular care and attendance of a doctor during the Qualifying Period and prevented him from performing a material duty of his occupation. As Union Security explained:

> We were unable to obtain treatment records prior to 1997 from Dr. Scott. Thus we have no documentation of [the plaintiff] being under the care and attendance of a doctor, as required by the policy. Further, the records that we have obtained do not document a disability at the time of Mr. Taylor's departure from [T&M]...[22]

Dr. Miller, who began treating the plaintiff in 2002, opined that he had symptoms of bipolar disorder which interfered with his ability to work in 2000 with certainty, and in 1995 with reasonable medical certainty.[23] Dr. Miller recognized, however, that "specific tests need to

---

21. Id. at pp. US 396-398 and 592.

22. Id. at p. US 110.

23. Id. at p. US 594.

be supplied in a disability determination and that documented evidence is the only true indicator of certifiable disability."[24] Here, no documented medical evidence on the plaintiff exists during the Qualifying Period. Thus, while the plaintiff's secretary, Ms. Schaukowitch, discusses his erratic behavior and declining job functioning during the relevant time period, she also explains that the plaintiff was beset by financial problems and worries over his wife's illness at that time, and at work, he often focused on his finances, his wife's medical bills and other personal affairs.[25] Could the plaintiff's personal problems have impacted his functioning at work, just as a possible sickness at that time?

Based on the lack of documentary medical evidence, and the fact that the plaintiff continued to work in his occupation until 2001, Union Security concluded it "was not able to identify any restrictions or limitations from the records submitted which would have prevented [him] from performing the material duties of his occupation ... as of November 30, 1995".[26] Under the heightened arbitrary and capricious standard, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record". Stratton, 363 F.3d at 256. Based on the limited record before it, Union Security's decision to deny the plaintiff's claim should not be overturned.

Therefore, it is recommended that the motion for summary judgment filed by

---

24.  Id. at p. US 369.

25.  Id. at pp. US 396-397.

26.  Id. at p. US 110.

defendant Union Security (Document No. 16) be granted.[27]

   Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

            Respectfully submitted,

            s/ ROBERT C. MITCHELL
            United States Magistrate Judge

Dated: April 1, 2008

---

27. In its motion for summary judgment, Union Security argued, in the alternative, that the plaintiff's claim was barred by the Pre-Existing Conditions Exclusion in its policy. We did not consider this alternate argument, however, for in denying the plaintiff's first appeal, Union Security apprised him: "Because you were covered by the previous policy with [T&M], we were able to apply that policy's pre-existing provisions to your claim. You would not be considered pre-existing under the prior policy...". See, p. US 133. A similar finding was conveyed to plaintiff's counsel by Union Security Appeal Specialist, Kimberly Myers by letter dated April 8, 2005. See, pp. US 123-124.